**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| BW Industries, Inc., | Case No. 23-10844 (MFW) |
| Debtor. | |
| In re: | Chapter 7 |
| Bitwise Industries, Inc., | Case No. 23-10845 (MFW) |
| Debtor. | |
| In re: | Chapter 7 |
| BWRD, LLC, | Case No. 23-10846 (MFW) |
| Debtor. | |
| In re: | Chapter 7 |
| Alpha Works Technologies, LLC, | Case No. 23-10847 (MFW) |
| Debtor. | |
| In re: | Chapter 7 |
| Bruce's Bagels, Beverages, and Bites, LLC, | Case No. 23-10848 (MFW) |
| Debtor. | **Hearing Date: August 23, 2023 at 2:00 p.m.**<br>**Objection Deadline: August 3, 2023 at 4:00 p.m.** |

**MOTION FOR DETERMINATION THAT THE AUTOMATIC**
**STAY DOES NOT STAY COMMENCEMENT AND PROSECUTION**
**OF LITIGATION TO DETERMINE USE OF INSURANCE PROCEEDS**
**OR, IN THE ALTERNATIVE, FOR STAY RELIEF**

Joseph T. Proietti and Ollen Douglass (collectively, sometimes, "Former Directors"),
pursuant to section 362 of title 11 of the United States Code and Federal Rule of Bankruptcy
Procedure 4001, respectfully request that this Court enter an order determining that the
automatic stay does not bar Former Directors from initiating and pursuing a separate lawsuit

(the "<u>D&O Insurance Declaratory Action</u>")[1] for the purpose of securing a declaratory judgment that the Directors and Officers and Company Liability Insurance Policy purchased by BW Industries, Inc. ("<u>Bitwise</u>")[2] both **(1)** precludes coverage for loss, including defense costs and expenses incurred, incurred by Bitwise's former co-Chief Executive Officers; and **(2)** provides coverage for loss, including defense costs and expenses incurred, suffered by the Former Directors in connection with currently pending litigation against the Former Directors. In the alternative, Former Directors respectfully request that this Court enter an order granting relief from the automatic stay for the limited purpose of permitting the Former Directors to file and pursue the proposed D&O Insurance Declaratory Action in California state court. Proposed forms of Orders are attached hereto.[3] In support of this Motion, Former Directors state as follows:

## PRELIMINARY STATEMENT

1.    These bankruptcy cases were filed shortly after it was discovered that Bitwise's former co-Chief Executive Officers, Jake Soberal and Irma L. Olguin, Jr. (collectively, the "<u>Former CEO Defendants</u>"), deliberately misrepresented the financial condition and profitability of Debtors' financial status and business to the general public, as well as to Bitwise's employees, Board of Directors, lenders, investors, and insurers. Several lawsuits were filed against Bitwise as a result, including multiple that seek to recover against some combination of the Former CEO Defendants, the Former Directors, and other members of the Board of Directors. The discovery of

---

[1]  A copy of the proposed Complaint is attached as **<u>Exhibit 1</u>**.

[2]  BW Industries Inc., the parent company, along with Bitwise, BWRD, LLC, Alpha Works Technologies, LLC, and Bruce's Bagels, Beverages, and Bites, LLC are the debtors and debtor-in-possession and are collectively referred to as "<u>Debtors</u>."

[3]   A proposed form of order determining that the automatic stay is not applicable is attached as **<u>Exhibit 3</u>** and a proposed form of order granting relief from stay is attached as **<u>Exhibit 4</u>**.

the Former CEO Defendants' misrepresentations and the subsequent initiation of the corresponding lawsuits ultimately led Bitwise and its related companies to commence the above-referenced Chapter 7 bankruptcy cases.

2.      Over the course of their fraudulent scheme, the Former CEO Defendants caused Bitwise to engage in multiple transactions with third parties under false premises concerning Bitwise's finances. Upon information and belief, one such transaction was the purchase by Bitwise of the Business and Management Indemnity Policy from Scottsdale Insurance Company (the "Insurer") bearing the policy No. EKS3476591 (the "Policy")[4] which would provide coverage subject to an annual aggregate limit for loss including defense costs, settlements, and judgments entered in lawsuits filed against Bitwise's directors and officers, as well as coverage for the company itself under certain circumstances.

3.      The Policy, however, contains a Warranty Provision which excludes coverage for certain Insureds under the Policy as to any Claim alleging, based upon, arising out of, or otherwise resulting from or involving any misrepresentation or omission of fact made in connection with the "Application" for the Policy. Among other things, the Warranty Provision excludes coverage for any "Insured" who is a natural person and who knew the facts misrepresented or the omissions made to the Insurer, whether or not such individual knew of the Application, such materials, or the Policy. The Former CEO Defendants are both "Insureds" who are not entitled to coverage under the Policy as the result of the Warranty Provision.

4.      Upon information and belief, despite the Warranty Provision, the Insurer has agreed to provide coverage under the Policy for the Former CEO Defendants for costs associated with the defense of various claims pending against the Former CEO Defendants.  Upon information and

---

[4] A true and accurate copy of the Policy is attached as **Exhibit 2**.

41896040.1

belief, despite the Warranty Provision, the Insurer also has agreed to provide coverage under the Policy for the Former CEO Defendants in defending criminal and/or governmental investigations. These defense costs are expected to be significant and will reduce the proceeds available for other Insureds under the Policy, including without limitation Proietti and Douglass.

5.      The Insurer has simultaneously refused to provide coverage to Proietti and Douglas for a particular lawsuit against Bitwise, the Former CEO Defendants, and the Former Directors, in which, among others, various wrongful employment practices are alleged (the "<u>Garza Lawsuit</u>"). The Insurer's declination of coverage for the Garza Lawsuit is based on the Insurer's erroneous application of an Employment Application Exclusion.

6.      Through this Motion, Former Directors Proietti and Douglas seek a determination that the automatic stay does not bar commencement and full prosecution of the D&O Insurance Declaratory Action  against the Former CEO Defendants and the Insurer seeking declarations that the Former CEO Defendants are not entitled to coverage under the Policy, and that the Employment Application Exclusion does not preclude coverage for the Former Directors in the Garza Lawsuit. In the alternative, Former Directors seek relief from the automatic stay to file and pursue the D&O Insurance Declaratory Action.

## FACTUAL BACKGROUND

### A.      *Background*

7.      The Former CEO Defendants co-founded the business venture that became Bitwise in Fresno, California, in 2013. By April 2023, Bitwise had grown to approximately 900 employees, with offices in six cities.

8.      Unbeknownst to the Former Directors, the Former CEO Defendants had been engaged in the concealment of material information and the active and intentional misleading of

4

investors, lenders, employees, partners, and the members of the Bitwise Board of Directors, along with the general public, for a lengthy period of time. The Former CEO Defendants' fraudulent scheme included the solicitation of loans and investments from parties using falsified financial records and information misrepresenting the financial strength of Bitwise. The Former CEO Defendants undertook these actions without the knowledge of the Board, often using freshly procured proceeds in order to appease previously defrauded parties.

9.      The Former CEO Defendants' scheme ground to a halt around Memorial Day weekend of 2023, when the Former CEO Defendants informed the Former Directors and other Board members that checks issued by Bitwise on the preceding Friday were going to bounce. Even then, the Former CEO Defendants represented that Bitwise had $77,000,000 in readily collectible receivables. These representations proved false. Bitwise was forced to furlough its employees

10.      Collectively, a series of lawsuits initiated against some combination of Bitwise, the Former CEO Defendants, and Bitwise's Board of Directors alleges a staggering array of financial losses suffered by innocent third parties as the result of dealings by the Former CEO Defendants in their individual capacity. The Former Directors were never made aware of many of the underlying transactions apparently entered into by the Former CEO Defendants on behalf of Bitwise, let alone the financial ramifications of the various transactions on Bitwise (and, by extension, the financial ramifications on various substantial investments into Bitwise made and/or authorized by the Former Directors).

11.      It is not yet clear exactly when the Former CEO Defendants began to mislead others, but given the massive scope of the fraud, it is apparent that these misrepresentations began well in advance of April 30, 2023.

## B.    The Policy

12.    Bitwise procured the Policy from the Insurer effective April 30, 2023. Upon information and belief, Bitwise provided misleading financial information to the Insurer in order to procure the Policy and/or any prior policy of which the Policy was a renewal. As active participants—and likely orchestrators—of the underlying fraudulent scheme, the Former CEO Defendants unquestionably knew of the underlying facts that were misrepresented or omitted in connection with the pursuit of the Policy.

13.    Upon information and belief, the false information provided to the Insurer as the result of the Former CEO Defendants' fraudulent scheme took the form of information provided in connection with the renewal application for insurance for the Policy, a series of prior renewal applications for predecessor policies, and/or the original application for insurance with the Insurer for the initial policy. The information falsely provided and/or the material information omitted in pursuit of the Policy would have included financial information concerning the assets, liabilities, revenue, operating income, certain types of expenses, certain amounts of debt held, and/or related financial information of the sort that the Former CEO Defendants had been falsifying in their provision of similar information to potential lenders, counterparties to contracts, investors, the Directors, and other innocent victims of their fraudulent schemes.

14.    Under these circumstances, the express language of the Policy precludes coverage for the Former CEO Defendants for any Claims pending against them arising out of or otherwise related to the facts that they misrepresented, omitted, or caused to be misrepresented or omitted to the Insurer.

41896040.1

15.     The Policy contains a Warranty Provision which, as modified by endorsement, provides the following exclusion to coverage that would otherwise be available to certain Insureds under the Policy:

> In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:
>
> a.      any **Insured** who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**; . . .

16.     The Warranty Provision does not contain any exclusion or otherwise limit the coverage available under the Policy for any natural person insureds who were unaware of the facts misrepresented or omissions in any Application or attached materials submitted to the Insurer to procure the Policy or any previous policy of which the Policy is a renewal.

17.     The General Terms and Conditions, as modified by endorsement, of the Policy also establish that the Insurer "shall not be entitled under any circumstances to rescind any Coverage Section of the Policy with respect to any Insured."

18.     The Policy also contains a Fraud Exclusion, which states:

> 1. Exclusions Applicable to All Insuring Clauses
>
> **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:
> > . . .
>
> f. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:
>
> i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

ii. the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f.ii. shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

When f.i. or ii. apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

19.     The Policy provides a $5,000,000 Limit of Liability in the aggregate for all "Loss" under the Directors and Officers and Company Coverage Section, subject to a retention of either $0 or $25,000, depending on the applicable insuring agreement.

## C.     The Breach, Fraud, and Employment Lawsuits

20.     At least seven lawsuits have been initiated against Bitwise and some combination of the Former CEO Defendants, the Former Directors, and other members of Bitwise's Board of Directors as the result of the fraudulent acts, misrepresentations, and omissions of the Former CEO Defendants.

21.     In February of 2023, one such lawsuit (the "Carter Lawsuit") was filed in the Superior Court of California, Fresno County, against Bitwise, the Former CEO Defendants, and others. The Carter Lawsuit asserted claims for breach of contract; breach of fiduciary duty; conversion; fraud; constructive fraud; intentional infliction of emotional distress; and elder abuse. These claims are related to a Joint Venture Agreement allegedly entered into between Bitwise and the Carter plaintiffs concerning a real estate tech company called "Listing Alert." The Former CEO Defendants never properly disclosed the existence of the Carter Lawsuit to the Board or other interested parties. The Carter Lawsuit is still pending.

22.     In early April 2023, another such lawsuit (the "1861 Acquisition Lawsuit") was filed in the Supreme Court of the State of New York, New York County against Bitwise and Former CEO Defendant Soberal. The 1861 Acquisition Lawsuit asserted claims for breach of contract; unjust enrichment; fraud; and conversion. These claims are related to alleged agreements

8

between Bitwise and Soberal to purchase Bitwise's interests in $6,000,000 worth of certain IRS

Employee Retention Credits refund checks that Bitwise expected to receive. This lawsuit alleges

that, despite having received the funds from the IRS subject to this agreement, Soberal did not

forward the funds to 1861 Acquisition per the terms of the alleged agreement. Soberal never

properly disclosed the existence of the 1861 Acquisition Lawsuit to the Board or other interested

parties. Bitwise settled the 1861 Acquisition Lawsuit with a $6,400,000 payment to the underlying

plaintiffs. Soberal likewise never disclosed the settlement or the payment to the Board.

23.     In May of 2023, another such lawsuit (the "NICbyte California Lawsuit") was filed

in the Superior Court of California, Fresno County against Bitwise and various affiliate or

subsidiary companies of Bitwise. The NICbyte California Lawsuit asserted claims for breach of

contract; breach of fiduciary duty; conversion; accounting; and injunctive relief. This lawsuit

alleges that NICbyte LLC entered into a joint venture agreement with Wishon Row, LLC, an entity

allegedly wholly owned, controlled, and managed by Bitwise, whereby another Bitwise-created

entity would directly or indirectly acquire and manage real properties in California. That entity

allegedly purchased five properties previously owned, directly or indirectly, by Bitwise for more

than $36,000,000. The NICbyte California Lawsuit alleges that the Former CEO Defendants

caused various related entities to enter into numerous loan agreements from December 2022

through March 2023, obtaining funds of at least $30,000,000 that were secured by the five real

properties, before ultimately listing four of the five properties for sale that had likely been pledged

as security for some or all of the $30,000,000 in loans. Yet another such lawsuit (the "NICbyte

Delaware Lawsuit") against Bitwise and various affiliate or subsidiary companies of Bitwise,

along with other defendants was also filed by NICbyte. None of the acts alleged in the NICbyte

Lawsuits to have been taken at the direction of the Former CEO Defendants were disclosed to or

authorized by the Board, including the solicitation of loans secured by these real properties or the decision to list some of the properties for sale. And the Written Consent alleged to have been provided by the Former CEO Defendants in connection with at least one of those loans appears to bear forged electronic signatures of members of the Board of Directors.

24.    On June 9, 2023, another such lawsuit (the "Agri Capital Lawsuit") was filed in the Superior Court of California, Fresno County, against certain Bitwise companies, every member of Bitwise's Board of Directors, and others. The Agri Capital Lawsuit asserts claims for fraud; intentional misrepresentation; negligent misrepresentation; statutory violations; concealment; breach of contract; breach of covenant of good faith and fair dealing; negligent supervision; breach of duty of care; and negligence. This lawsuit alleges another set of unauthorized loan solicitations by one or more of the Former CEO Defendants. As alleged in the Agri Capital Lawsuit, Former CEO Defendant Soberal solicited a $5,000,000 loan from Jim Maxwell, CEO and majority shareholder of Agri Capital, Inc., for Bitwise. Soberal is alleged to have represented that Bitwise needed to repay an IRS Employee Retention Credit purchaser; that Bitwise had $65,000,000 in a bank account but could not use those funds due to a liquidity covenant with Goldman Sachs; that Goldman Sachs led a syndicate planning to invest $80,000,000 in Bitwise on or before May 31, 2023; that Bitwise had been appraised at $257,000,000 but Soberal believed the valuation was in fact $500,000,000; and that Bitwise's 2022 revenue exceeded $200,000,000. Soberal allegedly indicated Agri Capital's loan would be secured by the personal shares of stock held by both Former CEO Defendants Soberal and Olguin, which Soberal valued at $28,000,000. Soberal also provided an allegedly fake document purporting to show a balance of $65,000,000 in the account of a Bitwise subsidiary. The Agri Capital Lawsuit alleges that Agri Capital executed a $1,000,000 term note with Bitwise; and that CAAG, LLC—an entity run by Jim Maxwell's son, Brian—agreed to

41896040.1

lend an additional $500,000 to Bitwise via another term note, secured by Bethany Mily's personal shares in Bitwise.

25.    Another such lawsuit (the "Catalyst Communications Lawsuit") was filed in the Superior Court of California, Fresno County, against Bitwise and Soberal, among others. The Catalyst Communications Lawsuit asserts claims for fraud and injunctive relief related to a $200,000 loan to Bitwise. Catalyst alleges that Soberal represented Bitwise had over $200,000,000 in revenue and $65,000,000 cash on hand in order to induce Catalyst into making the loan without security.

26.    Most, if not all, of the representations allegedly made by Soberal in connection with the above referenced loans were false, misleading, or both. The Board of Directors of Bitwise—and specifically both Proietti and Douglass—had no knowledge that either of the Former CEO Defendants was soliciting these loans or investments, or that they were making these representations. None of the acts of the Former CEO Defendants in furtherance of their fraudulent scheme were authorized by the Board.

27.    Following the collapse of Bitwise due to the Former CEO Defendants' wide-ranging fraudulent scheme, multiple lawsuits were also filed on behalf of certain employees alleging, among other things, wrongful termination of their employment and other employment based claims.

28.    Like the lawsuits described above, these lawsuits seek to recover monetary and non-monetary damages from Bitwise and certain of its directors and officers, including the Former CEO Defendants and Proietti and Douglass, resulting from the actual or alleged errors, omissions, misleading statements, misstatements, neglect, breaches of duty, or acts allegedly committed or attempted by Bitwise and its directors and officers.

29.     One such lawsuit (the "Garza Lawsuit") was brought on behalf of several individually named claimants, as well as others similarly situated, in their capacity as <u>employees</u> of Bitwise.

30.     The Garza Lawsuit alleges that each individually named claimant was an employee of Bitwise.

31.     The Garza Lawsuit seeks to assert claims on behalf of four subclasses, each of which consist exclusively of class members "who were employed by Defendants."

32.     The Garza Lawsuit claimants assert claims against Bitwise and the Bitwise Directors and Officers, including both Former CEO Defendants and the Bitwise Directors, including Proietti and Douglass, seeking damages arising out of the allegedly unlawful termination by Bitwise of Bitwise's employees and related wrongful acts concerning the employment of the Garza Lawsuit claimants.

33.     The Garza Lawsuit accordingly seeks to impose a legal obligation on various Bitwise Directors, including Proietti and Douglass, to pay "Loss" by reason of a "Claim" for a "Wrongful Act," as each of those terms are defined in the Policy's Directors and Officers and Company Coverage Section.

**D.      *The Insurer's Denial of Coverage for the Garza Lawsuit***

34.     Douglass and Proietti provided timely notice of the Garza Lawsuit to the Insurer.

35.     The Insurer declined coverage for the Garza Lawsuit on the basis of an Applicants for Employment Exclusion, which provides as follows:

> 1. Exclusions Applicable to All Insuring Clauses
>
> Insurer shall not be liable for Loss under this Coverage Section on account of any Claim:
>
> . . .

m. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, ***any employment or employment-related matters brought by or on behalf of or on the right of an applicant for employment with the Company,*** or any of the Directors and Officers, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the Company;

(emphasis added).

36.     The Applicants for Employment Exclusion only applies to exclude coverage for any Claim involving "any employment or employment-related matters brought by or on behalf of or on the right of ***an applicant for employment with the Company***." (emphasis added).

37.     The Garza Lawsuit does not involve "applicants for employment with the Company," as it solely seeks relief for claims asserted by employees of Bitwise. Thus, the Applicants for Employment Exclusion cannot apply to preclude coverage for the Garza Lawsuit.

**E.     *Erosion of Limits under the Policy; Priority of Payments Provision***

38.     Many, if not all, of the lawsuits described above asserting claims against some combination of the Former CEO Defendants, other members of Bitwise's Board of Directors, and Bitwise itself seek to recover damages approaching or in excess of the Policy's $5,000,000 aggregate limit of liability.

39.     Because the definition of "Loss" includes both judgments, settlements, pre-judgment or post-judgment interest awarded by a court, on the one hand, and "Costs, Charges, and Expenses" incurred by Insureds in defending "Claims," on the other hand, the $5,000,000 aggregate limit for "Loss" is eroded by both categories of "Loss."

40.     Moreover, the effect of the aggregate limit is that "Loss" suffered by any one Insured under the Policy—including defense costs—would erode the limits of coverage otherwise available to other Insureds under the Policy.

41.    The Policy also contains a Payment Priority provision, which states:

1. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss**, subject to such Limit of Liability, in the following priority:

a. First, the **Insurer** shall pay any **Loss** covered under Insuring Clause A.1. in excess of any applicable Retention shown in Item 3. of the Declarations; and

b. Second, only if and to the extent the payment under subsection 1. above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item 3. of the Declarations covered under any other applicable Insuring Clause.

c. Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Company**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Parent Company** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

42.    The Policy's Insuring Clause A.1 described in the above excerpt of the Policy concerns the payment by the Insurer of the Loss of the "Directors and Officers for which the Directors and Officers are not indemnified by the Company and which the Directors and Officers have become legally obligated to pay be reason of a Claim first made against the Directors and Officers during the Policy Period . . . for any Wrongful Act taking place prior to the end of the Policy Period."

43.    The Former Directors Proietti and Douglass seek to initiate the D&O Insurance Declaratory Action in order to protect their interests, and the interests of other innocent victims of the Former CEO Defendants' fraudulent scheme, in the insurance proceeds available under the Policy; and to terminate the ongoing erosion of funds available for that purpose through the reimbursement of defense expenses and other forms of Loss suffered by the Former CEO Defendants, in keeping with the plain language of the Policy's Warranty Provision.

14

## RELIEF REQUESTED

44.     Former Directors respectfully request a determination that commencement of the D&O Insurance Declaratory Action with respect to the Policy is not subject to the automatic stay because the Policy and its proceeds are not estate property. Alternatively, Former Directors assert that, even if the estates have an interest in the Policy that would be protected by the stay, such interest is expressly subordinate to the Former Directors' interests in the Policy pursuant to the Payment Priority provision. Absent the requested relief, the Insurer will improperly diminish the aggregate of what is available under the Policy by improperly advancing defense costs and other reimbursements of Loss sustained by the Former CEO Defendants.

## BASIS FOR RELIEF REQUESTED

### I.    The Stay Is Inapplicable

45.     The automatic stay of Code section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The central question is whether the proceeds of the Policy coverage for the Directors and Officers is property of the estate.

46.     The Third Circuit has established four rules for determining whether an insurance policy is property of the estate:

> (1) "[w]hen a debtor's liability insurance policy provides direct coverage to the debtor the proceeds **are** property of the estate, because the proceeds are payable to the debtor."

> (2) "[w]hen the liability insurance policy only provides direct coverage to the directors and officers the proceeds **are not** property of the estate."

> (3) "[w]hen there is coverage for the directors and officers and the debtor, the proceeds **will be property of the estate** if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."

15

(4) "[w]hen the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds **are not** property of the bankruptcy estate."

*See In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 572–73 (Bankr. D. Del. 2022), aff'd, 650 B.R. 87 (D. Del. 2023) (canvasing Third Circuit authority including *In re Allied Digital Techs., Corp.*, 306 B.R. 505 (Bankr. D. Del. 2004)).

47.    The Directors and Officers and Company Coverage Section of the Policy provides the following insuring clauses:

A. INSURING CLAUSES

1. The Insurer shall pay the Loss of the Directors and Officers for which the Directors and Officers are not indemnified by the Company and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period, and reported to the Insurer pursuant to Section E.1. herein, for any Wrongful Act taking place prior to the end of the Policy Period.

2. The Insurer shall pay the Loss of the Company for which the Company has indemnified the Directors and Officers and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period, and reported to the Insurer pursuant to Section E.1. herein, for any Wrongful Act taking place prior to the end of the Policy Period.

3. The Insurer shall pay the Loss of the Company which the Company becomes legally obligated to pay by reason of a Claim first made against the Company during the Policy Period or, if applicable, the Extended Period, and reported to the Insurer pursuant to Section E.1. herein, for any Wrongful Act taking place prior to the end of the Policy Period.

Business and Management Indemnity Policy Directors and Officer and Company Coverage Section, Section A. Additionally, the Policy specifically spells out the payment priority on any loss:

41896040.1

H. PAYMENT PRIORITY

1. If the amount of any Loss which is otherwise due and owing by the Insurer exceeds the then remaining Limit of Liability applicable to the Loss, the Insurer shall pay the Loss, subject to such Limit of Liability, in the following priority:

    a. **First**, the Insurer shall pay any Loss covered under Insuring Clause A.1. in excess of any applicable Retention shown in Item 3. of the Declarations; and

    b. **Second**, only if and to the extent the payment under subsection 1. above does not exhaust the applicable Limit of Liability, the Insurer shall pay any Loss in excess of the Retention shown in Item 3. of the Declarations covered under any other applicable Insuring Clause.

    c. Subject to the foregoing subsection, the Insurer shall, upon receipt of a written request from the Chief Executive Officer of the Parent Company, delay any payment of Loss otherwise due and owing to or on behalf of the Company until such time as the Chief Executive Officer of the Parent Company designates, provided the liability of the Insurer with respect to any such delayed Loss.

Business and Management Indemnity Policy Directors and Officer and Company Coverage Section, Section H (emphasis added).

48. Based on the plain language of the Policy, the first three rules established by the Third Circuit for determining whether an insurance policy is property of the estate do not apply here. The first two rules do not apply because there is no direct coverage for the Debtors unless the limit has not been exhausted on payment of loss of the directors and officers. This means that while there could be some residual coverage for the Debtor(s) at some point in time, that coverage is to be paid for the indemnification of the directors and officers. The Policy is clearly primarily intended to cover loss sustained by the directors and officers. The Debtors do not have any rights to the proceeds other than a contingent expectancy to any amounts not needed to reimburse the Directors or Officers like the Former Directors. Similarly, the third rule does not apply because

41896040.1

depletion of the proceeds will not have an adverse effect on the estate since the Policy proceeds are never likely to be paid to the Debtor. This is because the Debtors are only covered to the extent the loss from the actions of the directors and officers does not exhaust the applicable limit of liability. Given the number of lawsuits and the amount of the claims alleged against the directors and officer, the Policy will likely be exhausted on loss related to the actions of the directors and officers. Even if it is not, any remaining proceeds will still be available following the pursuit of the D&O Insurance Declaratory Action sought by the Former Directors in this Motion. The estate will not be impacted either way.

49.    Instead, the fourth rule applies here because the Policy provides Bitwise with indemnification coverage but indemnification has not occurred, is hypothetical, or speculative. Therefore, the proceeds are not property of the bankruptcy estate. *See, e.g., id.; see also In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004); *Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem '1 Corp.)*, 382 B.R. 652, 686-89 (Bankr. D. Del. 2008) ("the estate's interests in the proceeds is defined by the terms of the policies and is in no way superior of other nondebtor parties intended to be benefited by the policies"); *Miller v. McDonald (In re World Health Alternatives, Inc.)*, 369 B.R. 805, 808-12 (Bankr. D. Del. 2007) (denying trustee's motion for preliminary injunction to enjoin prosecution or settlement of action against debtor's former officers and directors that might deplete proceeds of policy because proceeds are not estate property); *In re Laminate Kingdom LLC*, 2008 WL 1766637, at *2-5 (Bankr. S.D. Fla. Mar. 13, 2008) (finding proceeds of coverage for directors and officers not estate property protected by stay); *In re Medex Reg'l Labs., Inc.*, 314 B.R. 716 (Bankr. E.D. Tenn. 2004) (proceeds of wasting policy covering officers and directors along with debtor not estate property where debtor's

potential claims under policy for indemnifying officer and director defendants, hypothetical and speculative).

50.      Here, many claims have been brought against the Former CEO Defendants and other members of the Board. The Policy provides direct coverage to the directors and officers for claims and defense costs (which are real and ongoing), and indemnification coverage to Bitwise for amounts paid to the directors and officers (which is hypothetical and/or has not occurred).

51.      Another real, justiciable, and immediate concern here is that the Former Directors will not be protected by the Policy as intended, because the Insurer will continue to reimburse the Former CEO Defendants for their Loss, effectively eroding proceeds otherwise available under the Policy. Because Bitwise is not yet entitled to the proceeds, the Policy is not property of the estate and Former Directors should be permitted to file the proposed D&O Insurance Declaratory Action.

## II.   Even If the Automatic Stay is Applicable, Relief from the Stay Should Be Granted

52.      Even if the Court finds that the Policy is property of the estate that the automatic stay protects under one of the rules, Former Directors should be permitted relief from the stay to file and pursue their proposed D&O Insurance Declaratory Action and request the Insurer be barred from using the Policy's proceeds to defend and indemnify the Former CEO Defendants, in keeping with the plain terms of the Policy.

53.      Under Code section 362(d)(1), the Court "shall" grant relief from the stay for "cause." 11 U.S.C. § 362(d)(1). "Cause" is not a defined term in the Code, and courts have wide discretion to find cause on a case-by-case basis. As explained recently in *In re SCO Group, Inc.*:

> Cause [under section 362(d)(1)] is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay.

395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997); *In re Laguna Assocs., Ltd.*, 30 F.3d 734, 737 (7th Cir. 1994); *Am. Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 152 B.R. 420, 424 (Bankr. D. Del. 1993)). The Court has broad discretion to grant stay relief for cause. *In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. 111, 130 (Bankr. D.N.J. 2003). Although the moving party must make a prima facie case for cause initially, code section 362(g) places the burden of proof on the issue of cause on any party opposing relief from the stay. *See, e.g., In re Brown*, 311 B.R. 409, 412 (Bankr. E.D. Pa. 2004); *In re Telegroup, Inc.*, 237 B.R. 87, 91 (Bankr. D.N.J. 1999).

54.    The nature of cause for stay relief means that the applicable test is a flexible one, too. *In re Cont'l Airlines, Inc.*, 152 B.R. at 424. The focus is the policies underlying the stay and the interests of the moving party and debtor. *Id.* In balancing the interests of the parties, courts look to: (1) whether the bankruptcy estate will suffer any prejudice through stay termination; (2) whether the hardship to the moving party if the stay remains in place outweighs the burden on the estate if relief is granted; and (3) the probability of the moving party's success on the merits. *In re W.R. Grace & Co.*, 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007) (citing *In re Cont'l Airlines, Inc.*, 152 B.R. at 424; *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992)). Furthermore, even when a policy coverage lawsuit would not have an adverse effect on the estate, but may actually prevent acts that diminish future recoveries from debtor's policies, the bankruptcy court may lift the stay to permit the exchange to be made. *See In re Boy Scouts*, 642 B.R. at 577.

55.    When balancing the interest of the parties, the factors strongly support lifting the automatic stay. ***First***, the bankruptcy estate will not suffer any prejudice through the stay termination. In fact, the estate can only benefit from the filing of Former Directors' proposed D&O

Insurance Declaratory Action. The Complaint seeks to preserve the amount of proceeds available to pay Insureds other than the Former CEO Defendants.

56.     **Second**, the harm to the Former Directors, along with the other innocent directors and officers, is present and substantial. They will lose the benefit of the insurance that was procured on their behalf in the form of the Policy, which was meant to provide a defense and otherwise cover Loss sustained by Directors and Officers of Bitwise in connection with lawsuits brought against them and Bitwise. In such circumstances—where there is a priority in coverage for insureds; the estate's interest is at best contingent; and there is ongoing harm to the insureds in the form of the erosion of the limits by the Former CEO Defendants—courts have readily found that the insureds' interests outweigh those of the estate and granted stay relief for cause so that the insureds can draw upon the insurance to defend themselves. *See, e.g., Allied Digital*, 306 B.R. at 513-14; *Laminate Kingdom*, 2008 WL 1766637, at *9-13 (discussing "numerous" other cases in which stay relief has been granted and stating "a D & O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection.").

57.     **Third**, the factor regarding probability of success on the merits favors Former Directors.  The rights of the directors and officers in any nonbankruptcy forum plainly would be senior to those of Bitwise, because those rights are governed by the plain language of the Policy and its Payment Priority provision. Based on the evidence available, there is a high probability that the California State Court will enter a judgment in favor of Former Directors' proposed Complaint, because the plain  language of the Policy compels this result.

58.     Finally, as a court of equity, see 11 U.S.C. § 105(a), this Court should be sensitive to the inequity of allowing the Insurers to protect the actors who caused Debtors' financial ruin rather than the innocent directors and officers. Refusal to lift the stay will result in a lose-lose

situation. As mentioned above, the likely damages from the Former CEO Defendants' fraudulent scheme are substantial, and there are a number of lawsuits already filed against the Former CEO Defendants with likely many more to come. Thus, the total amount of the Policy may be exhausted substantially by the provision of a defense to the fraudulent actors absent a prompt award of equitable relief. Additionally, if the stay is not lifted in order to permit the pursuit of the D&O Insurance Declaratory Action, any interest the estate may have in the Policy's proceeds is certainly not preserved.

59.     In summary, both the balance of the harms, any relevance of probability of success on the merits and fundamental equity all intersect at the granting of this Motion. There is "cause" for this Court to grant Former Directors stay relief so that they may file the proposed Complaint to preclude coverage associated with defense costs and expenses of its former CEOs, who orchestrated a fraudulent scheme while employed by the Debtors.

<u>**CONCLUSION**</u>

60.     The rights of the Debtors under the Policy did not expand with the filing of its chapter 7 case. The estate's rights to reimbursement for indemnification not only are junior to the director and officer's rights to direct coverage, but are remote, since no judgments have been entered against the insured directors and officers. Any judgment against the insured directors and officers *could* be subject to the Policy or excluded. Which is the exact purpose for Former Directors' proposed Complaint. For these reasons, the proceeds of the Policy are not estate property at this time, and the automatic stay does not apply to the Former Directors to litigate the rights to access them. Alternatively, the Former Directors has established cause exists for granting stay relief to proceed with the coverage litigation. Even if the stay does

apply in light of the foregoing facts and Former Directors needs to be able to defend himself

with the proceeds for Bitwise bargained for.

Dated: July 20, 2023                                   Respectfully submitted,

**SAUL EWING LLP**

By:  /s/ *John D. Demmy*
John D. Demmy (DE Bar No. 2802)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: 302-421-6848
john.demmy@saul.com

-and-

**STINSON LLP**

Paul B. Lackey (TX Bar No. 00791061)
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
Telephone (214) 560-2201
paul.lackey@stinson.com

Clarissa Brady (AZ Bar No. 036312)
1850 N. Central Avenue, Suite 2100
Phoenix, AZ 85004
Telephone: (602) 212-8601
clarissa.brady@stinson.com

*Attorneys for the Former Directors*